## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:14-cv-273-FDW

CHRISTOPHER JOHN HORTON,       )
                                    )
           **Petitioner,**         )
                                    )
**vs.**                             )        **ORDER**
                                    )
                                    )
**STATE OF NORTH CAROLINA,**     )
                                    )
          **Respondent.**       )
_____ )

      **THIS MATTER** comes before the Court on Respondent's Motion for Summary Judgment, (Doc. No. 8).

## I.      BACKGROUND

### A.     Procedural Background

      Petitioner is a prisoner of the State of North Carolina who was convicted on August 5, 2011, following a jury trial in Gaston County Superior Court on four counts of indecent liberties with a child (one count named Michael Young as the victim and three counts named Matthew Young (Michael's younger brother) as the victim), two counts of first-degree sex offense (one named Michael the victim and the other named Matthew the victim), and two counts of statutory sex offense (both counts named Matthew as the victim). The court arrested judgment on one of the first-degree sex offense charges. Defendant was sentenced to a total term of 542 to 670 months of imprisonment. Petitioner appealed, contending that trial counsel provided him with ineffective assistance of counsel by failing to prevent the jury from hearing inadmissible evidence concerning polygraph testing and that the trial court erroneously instructed the jury

concerning the effect of false, contradictory, or conflicting evidence made by Petitioner. On

February 19, 2013, in an unpublished opinion, the North Carolina Court of Appeals found no

error and affirmed Petitioner's convictions.  State v. Horton, No. COA12-366, 2013 WL 599953

(N.C. Ct. App. Feb. 19, 2013).

The North Carolina Court of Appeals summarized the facts from Petitioner's trial as

follows:

> 1. State's Evidence
>      a. Michael Young's Testimony
>      Michael Young testified that he was born in 1982 and that his parents
> separated in 1992, shortly after the birth of his younger brother, Matthew. After
> their parents' divorce, Michael and Matthew lived with their mother, Susan
> Young, in Iron Station, North Carolina. In 1994, Michael joined the Boy Scouts
> and met Defendant, who was then about twenty-two years old and served as an
> assistant scoutmaster of the troop to which Michael belonged.
>      In 1995, Defendant began taking Michael to various activities and events
> and "tr[ied] to be a father figure for [him.]" In 1996, Defendant began living with
> the Young family; Michael and Matthew shared a room, while Defendant and Ms.
> Young had individual bedrooms. At that time, Michael was about fourteen years
> old, while Matthew was three or four. Defendant required the boys to address
> him as "Dad" and became angry if they forgot to do so. Defendant bought
> clothing and shoes for Michael and took him on outings. Michael's mother
> sometimes left Defendant alone with her sons for several days.
>      Defendant assisted Michael in connection with his attempt to earn the Boy
> Scout photography merit badge. As part of that process, Defendant would pick
> Michael up and take him to Defendant's house, where he taught Michael about
> various aspects of photography. While they were working on the photography
> merit badge at Defendant's residence, Defendant began talking with Michael
> about sexual matters. Among other things, Defendant offered to show Michael
> how to masturbate; showed Michael pornographic videos; and, after Michael
> became aroused while watching these videos, offered to masturbate Michael.
> Defendant kissed Michael, performed oral sex on him, and got Michael to
> perform oral sex on him and to masturbate him. Although Defendant attempted to
> have anal sex with Michael, he stopped when Michael complained of pain.
> According to Michael, Defendant initially offered to "teach" him how to kiss,
> after which "it moved to the masturbation, then it moved to the oral sex, and then
> to the try of the anal sex." Defendant "told [Michael] that this is how fathers
> taught their kids about sex." During his testimony, Michael described a specific
> feature of Defendant's genitals.
>      After about a year of sexual activity, Michael told Defendant that he

wanted to stop. At the time that Michael made this request, Defendant became angry and said he "was just teaching [him]" and that "this is what a father does for his son[.]" After Michael made this request of Defendant, the level of sexual activity between them diminished, with their last sexual encounter occurring when Michael was sixteen or seventeen. Because Defendant told him not to discuss the matter with his mother, Michael refrained from telling his mother or his father about Defendant's conduct.

When Michael was in college, he confronted Defendant about what had happened between them. Defendant asked if Michael was going to report his activities to the police, told Michael that "everything he did was to help [Michael] to learn," and stated that, while he "never meant to hurt" Michael, "he [knew] now that he made a mistake." Defendant was "crying [and] apologizing" during this conversation and said "that he would never do that to anyone else." As a result, Michael agreed to refrain from contacting the police "if [Defendant] promised to never do that to anyone else again."

In June 2010, Matthew told Michael that Defendant had engaged in sexual acts with him, including masturbation and oral sex. On 26 June 2010, Michael confronted Defendant about his sexual abuse of Matthew, at which point Defendant asked if Matthew was going to report him, pointed out that he had "done so much for [Michael and Matthew,]" and said that he "d[id]n't deserve this." The next week, Matthew contacted the police.

b. Matthew Young's Testimony

Matthew Young, who was born in November 1992, was about two years old when Defendant became involved with his family. Matthew thought of Defendant, who had spent time with Michael and Matthew as long as he could remember, as "[his] dad." When Matthew was six or seven, he joined a Cub Scout troop. Defendant was "very supportive" of Matthew's progress through Cub Scouts. After completing the Cub Scout program when he was ten or eleven, Matthew joined the Boy Scout troop led by Defendant. Matthew continued to be a member of Defendant's Boy Scout troop until he was seventeen and a half years old. During that time, Defendant drove Matthew to and from scout meetings, spent time with him on other occasions, and was very involved in his life. Matthew's mother would leave Matthew alone with Defendant for periods lasting as long as an entire weekend.

When Matthew was around twelve years old, Defendant started discussing sexual subjects with him and showing him pornographic magazines at his office. In addition, Defendant showed Matthew pornographic videos, after which "things progressed to touching one another." Defendant engaged in mutual masturbation and oral sex with Matthew and told Matthew that "everything was okay" because he was Matthew's father and was "teaching" him. After Defendant had been having oral sex with Matthew for several months, he began having anal sex with him, once again telling Matthew that he was "just teaching" him. Defendant engaged in various sexual activities with Matthew for over a year, with these activities having taken place in a variety of locations, including Matthew's home, Defendant's office, and on scouting trips. For example, when Defendant took

3

Matthew on certain Boy Scout events, they would stay in a hotel and engage in sexual activities instead of camping with the other Scouts and Scout leaders.

The sexual activity between Defendant and Matthew stopped between Matthew's sixteenth and seventeenth birthdays. As best Matthew could remember, he had more than 100 sexual encounters with Defendant between 2004 and 2007. During the summer between his junior and senior years of high school, Matthew told Michael what had happened between him and Defendant. Although Matthew was reluctant to report Defendant to the authorities, Michael told Matthew that Defendant had promised ten years earlier to refrain from engaging in sexual acts with a young boy. As a result, Matthew decided that, unless he reported Defendant's conduct, Defendant might engage in similar activities with someone else. For that reason, Matthew reported Defendant's conduct to officers of the Lincoln County Sheriff's Department and told officers specific details about Defendant's genitals.

c. Susan Young's Testimony

Susan Young, Michael and Matthew's mother, corroborated Michael's and Matthew's account of Defendant's involvement with their family. Ms. Young became acquainted with Defendant in 1994 as a result of Michael's participation in scouting. In 1996, Defendant moved in with the Young family for a year or two. As a result of the fact that she trusted Defendant, Ms. Young did not object to her sons calling him "dad" or to the role that he played in her family. Although Michael and Matthew spent a great deal of time alone with Defendant, Ms. Young did not suspect that Defendant had directed any inappropriate conduct toward her sons. In June 2010, Matthew told her that Defendant had abused him. Having previously had a brief sexual relationship with Defendant, Ms. Young was able to describe the same physical feature exhibited by Defendant's genitals which Michael and Matthew had noticed.

d. Other Prosecution Witnesses

Sherri Lynn Smith-Martin, who had lived next door to the Young family beginning around 1984, knew Defendant as a friend of the Young family from and after 1994. Among other things, Ms. Smith-Martin heard Michael and Matthew calling Defendant "dad" and observed Defendant playing a parental role in the children's lives. On several occasions, Ms. Smith-Martin saw Defendant kiss Michael or Matthew on the lips. Ms. Smith-Martin's son, Jeffrey Martin, recalled instances in which Defendant kissed Michael on the lips or grabbed his buttocks while playing outside. Similarly, Ms. Smith-Martin's daughter, Kristen Martin, remembered seeing Defendant kiss Michael and Matthew on their lips.

2. Defendant's Evidence

a. Defendant's Testimony

Defendant grew up in Stanley. After becoming involved with Boy Scouts when he was about ten years old, Defendant eventually earned Eagle Scout rank. In 1994, Defendant returned to scouting, serving as assistant scoutmaster and then as scoutmaster of the troop to which Michael and Matthew belonged. Defendant met Michael because he was a scout in Defendant's troop and met Ms. Young at a Scouting-related parents' event.

In 1995, Defendant had a sexual relationship with Ms. Young and began to develop a "fatherly" relationship with Michael. Among other things, Defendant "coached [Michael's] team," "went to his school activities" and "was his dad in every way," with the two of them becoming sufficiently close that Michael even referred to Defendant as "dad." After Michael finished high school, the two spoke on the phone frequently. Similarly, Defendant met Matthew when he was just a few years old, "became his dad in every way," and attended Matthew's sporting and band events. Defendant testified that he had a close relationship with Michael and Matthew, that he had "been their dad for 15 years," and that he had taken responsibility for "all the discipline."

Defendant denied having helped Michael earn his photography merit badge, having had pornographic magazines at his home or office, or having had a "sexual relationship" with Michael. He did, however, admit having kissed Michael on the mouth, having spent time alone with Michael, and having driven him places. Similarly, Defendant denied having ever slept in the same tent with Matthew, having had pornography at his store, or having ever engaged in any sort of sexual activity with Matthew. Finally, Defendant denied that his genitalia had the specific characteristic that Matthew, Michael, and Ms. Young had described and supported his denial with photographic evidence.

In 2002, Defendant started dating a woman named Machelle Thomas, whom he later married. As a result of the fact that Machelle had two young children, Defendant "became their dad as well." In 2001, Defendant started a new Boy Scout troop and served as head scoutmaster of that group until his arrest in 2010. Machelle's son, Shane, and Matthew were the same age and were both members of Defendant's troop.

On cross-examination, Defendant testified that, after being publicly accused of sexual misconduct, he had created a website named "innocent scouter." In addition, Defendant conceded that he had provided the State with a day-planner which did not contain many entries relating to the time during which the State contended the alleged abuse had occurred despite containing numerous entries for the period of time specified in certain other indictments. Defendant admitted having kissed Matthew and Michael on the mouth until they were about 14 years old. Although Defendant represented himself as Matthew and Michael's "dad," he never had any sort of legally recognized relationship with them. Finally, Defendant acknowledged that he had gone to a Scouting event with Matthew a few days early and had stayed in a hotel room with him.

b. Other Defense Testimony

Machelle Horton testified that she met Defendant in 2001 and married him in 2005. Ms. Horton, who had two young children, met Defendant through the Scouting program just after separating from her first husband. Ms. Horton never observed pornography at Defendant's store or saw any indications of a sexual relationship between Defendant and either Matthew or Michael.

Ms. Horton's son, Shane Campbell, testified that, on one of the trips during which Matthew claimed that sexual activity had occurred between Defendant and himself, Defendant and Matthew had slept in the same bed.

However, Shane did not observe anything unusual happening during that trip. Although Defendant had answered Shane's questions about sex, taught him how to masturbate, and told him to discuss sexual matters with Defendant rather than with his mother, Defendant had never made any sexual advances toward Shane.

Mike Hudson, an assistant scoutmaster in Defendant's troop, had accompanied Defendant on a number of scouting trips. However, he never observed anything inappropriate about the relationship between Defendant and Matthew. In the same vein, Mike Hudson's son, Ryan, who had belonged to Defendant's Boy Scout troop, testified that he had not seen any indication that Defendant was engaging in sexual behavior with Matthew. Finally, several members of Defendant's Scout troop testified that Defendant never made advances toward them and that they had never observed any evidence that Defendant acted inappropriately toward Matthew.

3. State's Rebuttal Evidence

In rebuttal, Detective Seth Bailey of the Lincoln County Sheriff's Department testified that he and Detective Michael Sumner had interviewed Defendant concerning Matthew and Michael's accusations on 30 June 2010 and made an audio recording of that interview. A recording of this interview, which will be discussed in greater detail below, was played for the jury. In addition, Millard McGee, Jr., and Geraldine Smith testified that Michael and Matthew had good reputations for honesty and truthfulness.

(Id. at **1-5).

Following the North Carolina Court of Appeals' affirmance of his conviction, Petitioner did not file a petition for discretionary review with the North Carolina Supreme Court. On December 11, 2013, Petitioner filed a motion for appropriate relief ("MAR") in Gaston County Superior Court, in which he raised fifteen issues. See (Doc. No. 1-2 at 1). On March 10, 2014, the MAR summarily denied Petitioner's MAR. (Id. at 79). On April 21, 2014, Petitioner filed a petition for a writ of certiorari with the North Carolina Court of Appeals. On April 28, 2014, the North Carolina Court of Appeals denied the petition.

Petitioner placed the habeas petition in the prison system for filing on May 21, 2014, and it was stamp-filed in this Court on May 28, 2014. Respondent filed the pending summary judgment motion on August 14, 2014. (Doc. No. 8). On August 15, 2014, the Court issued an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Petitioner of his

obligation to respond to the summary judgment motion. (Doc. No. 10). On September 3, 2014, Petitioner filed a response to the summary judgment motion. (Doc. No. 13). Petitioner brings the following claims in the petition: (1) trial counsel was ineffective because he failed to forewarn the court that the audio tape of Petitioner's police interview the State proposed to play during its rebuttal case contained a second reference to a polygraph; as a result the jury heard an exchange between Petitioner and police which suggested Petitioner had refused to take a polygraph; (2) trial counsel was ineffective because he introduced duplicate photographic exhibits that prevented Petitioner from fully establishing that his penis did not have a characteristic the victims described, and which allowed the State to impeach Petitioner; (3) trial counsel was ineffective because he subpoenaed the victims' medical records in violation of the Health Insurance Portability and Accountability Act and, as a result, Petitioner was only allowed to use them for limited purposes; (4) trial counsel was ineffective because he failed to object to the use of the word "victim"; (5) trial counsel was ineffective because he failed to present the video tape of Michael's (the older victim's) police interview wherein law enforcement told Michael that the prosecution "would not touch the case" without a second victim, after which Michael's brother Matthew (the younger victim) came forward with similar allegations; (6) trial counsel was ineffective because he failed to develop evidence that Matthew told the Department of Social Services that his mother was aware of the sexual abuse; (7) trial counsel was ineffective because he failed to exploit Matthew's statement to his doctor that he had only recently become sexually active and had only one sexual partner—his girlfriend; (8) trial counsel was ineffective because he failed to acquire the audio recording of a police interview with another child who one of the victims identified as a potential victim, but who subsequently denied any abuse; (9) trial counsel was ineffective because he did not petition the trial court to obtain transcripts of opening

7

statements, closing statements, and media played to the jury; (10) trial counsel was ineffective because he did not move to have stricken from the record testimony to which objections had been sustained; (11) trial counsel was ineffective because he failed to call Matthew's girlfriend and expose that she had accused her own stepfather of sexual abuse; (12) trial counsel was ineffective because he implied three times in front of the jury that the sexual abuse had occurred; (13) appellate counsel was ineffective because he failed to raise on direct appeal that an evidence technician was improperly allowed to give expert testimony; (14) appellate counsel was ineffective because he failed to raise on direct appeal Brady violations; and (15) appellate counsel was ineffective because he failed to raise on direct appeal trial counsel's ineffectiveness for his failure to move to strike from the record certain testimony for which objections had been sustained.

## II.     STANDARD OF REVIEW

### A. Summary Judgment Standard

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

### B. Section 2254 Standard

In addition to the motion for summary judgment standard set forth above, this Court must

also consider the petition for writ of habeas corpus under the requirements set forth in 28 U.S.C. § 2254.  Section 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Tice v. Johnson, 647 F.3d 87, 103 (4th Cir. 2011).

A state court decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result][.]"  Williams v. Taylor, 529 U.S. 362, 405 (2000); Lewis v. Wheeler, 609 F.3d 291, 300 (4th Cir. 2010) (quoting Williams, 529 U.S. at 405).  A state court unreasonably applies federal law when it "identifies the correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case." Williams, 529 U.S. at 407; Lewis, 609 F.3d at 300-01 (stating that a state court unreasonably applies federal law when it "extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply[ ]") (citation and quotation marks omitted).

"[A]n unreasonable application of federal law is different from an incorrect application of federal law" for § 2254(d)(1) purposes.  Williams, 529 U.S. at 410.  The former requires a "substantially higher threshold" to obtain relief than does the latter.  Schiro v. Landrigan, 550 U.S. 465, 473 (2007).  A state court's determination that a claim fails on its merits cannot be overturned by a federal habeas court "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

A habeas court, therefore, must "determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court."  Richter, 131 S. Ct. at 786.  A petitioner has the burden of establishing that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 786-87.

## III.    DISCUSSION

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  See U.S. CONST. amend. VI.  To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010).  Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant

relief under . . . <u>Strickland</u> if the 'result of the proceeding was fundamentally unfair or unreliable.'" <u>Sexton v. French</u>, 163 F.3d 874, 882 (4th Cir. 1998) (quoting <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369 (1993)).  Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." <u>Bowie v. Branker</u>, 512 F.3d 112, 120 (4th Cir. 2008).  If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." <u>United States v. Rhynes</u>, 196 F.3d 207, 232 (4th Cir. 1999), <u>opinion vacated on other grounds</u>, 218 F.3d 310 (4th Cir. 2000).  Finally, a federal habeas court's review of a state court's denial of an ineffective assistance of counsel claim is "doubly deferential." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786-88 (2011).  That is, when both § 2254(d) and <u>Strickland</u> apply, the question becomes whether "there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Id.</u> at 788.

A.  Ground One

In Ground One, Petitioner claims that he received ineffective assistance of counsel when defense counsel failed to forewarn the trial court that an audio tape of Petitioner's police interview that the State proposed to play in its rebuttal case contained a second reference to a polygraph examination.   While the trial court muted the first reference and the jury did not hear it, the court did not mute the second reference and the jury heard that.  As a result, the jury heard one of the officers tell Petitioner that "I bet [one of the victim's] would take a polygraph," implying that Petitioner had refused to submit to a polygraph examination.  Petitioner raised the Sixth Amendment polygraph claim on direct appeal, but he never presented that claim to the North Carolina Supreme Court.  Because Petitioner did not present the claim to the North Carolina Supreme Court, he failed to exhaust this claim.  <u>See</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 848 (1999).  In any event, the North Carolina Court of Appeals' adjudication of this claim

11

was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

On direct appeal, the North Carolina Court of Appeals concluded that any potential prejudice by the jury's exposure to the brief reference to the polygraph test was ameliorated by the trial court's lengthy curative instruction.  See Horton, 2013 WL 599953, at *10.  The North Carolina Court of Appeals stated:

> Our conclusion to this effect is reinforced by an examination of the factual record developed before the trial court, which leads us to conclude that it is not reasonably probable that Defendant would have been acquitted had the jury not heard the offending evidence. As Defendant correctly points out, the State did not offer independent eyewitness testimony confirming the descriptions of Defendant's conduct provided by Michael and Matthew or any forensic evidence tending to confirm their claims. For that reason, the crucial issue before the jury was the relative credibility of Michael and Matthew, on the one hand, and Defendant, on the other. All three of these witnesses testified at length and were subject to extensive cross-examination, including considerable discussion of apparently ancillary matters such as whether Defendant's genitalia had a particular appearance and whether there was a Denny's restaurant located near any motels in Shelby. Thus, the jury had an ample basis upon which to evaluate the relative credibility of the witnesses whose testimony was critical to the outcome in this case. Under that set of circumstances, particularly given that Defendant admitted that he kissed Michael and Matthew on the mouth until their early teenaged years, that Defendant admitted having provided sexually oriented instructions to Michael and Matthew, and that the pattern of entries in Defendant's day planner could be construed as indicating that Defendant had fabricated evidence in an effort to bolster the strength of his case, we conclude that there is no reasonable probability that the outcome at Defendant's trial would have been different had the jury not heard the brief reference to polygraph questioning that was inadvertently allowed to remain in Defendant's recorded statement. As a result, Defendant is not entitled to relief on appeal on the basis of his ineffective assistance of counsel claim.

(Id.).  The North Carolina Court of Appeals' adjudication of Petitioner's first claim was neither contrary to nor an unreasonable application of Strickland, as Petitioner has not shown that the outcome of the trial would have been different even without the alleged deficient performance by counsel.  Furthermore, as noted above, a federal habeas court's review of a state court's denial of

an ineffective assistance of counsel claim is "doubly deferential." <u>Richter</u>, 131 S. Ct. at 786-88.

That is, when both § 2254(d) and <u>Strickland</u> apply, the question becomes whether "there is any

reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Id.</u> at 788. In sum,

for the reasons stated herein, Petitioner's first claim is without merit.

B.      Grounds Two to Twelve

In Grounds Two to Twelve, Petitioner alleges various claims of ineffective assistance of

trial counsel. Petitioner raised these claims in his MAR, and the MAR denied the claims,

concluding that Petitioner's MAR "does not state a claim."[1] (Doc. No. 1-2 at 79). Thus, the

MAR Court summarily denied Petitioner's claim on the merits. For the following reasons, the

MAR Court's adjudication of Petitioner's Grounds Two to Twelve was neither contrary to nor an

unreasonable application of clearly established Supreme Court law.

First, as to Petitioner's claims Five, Six, Seven, Eight, and Eleven, each of these claims

relates to strategic or tactical decisions by defense counsel—specifically, whether counsel should

have called certain witnesses or presented evidence, all of which had the potential to bolster the

victims' credibility, evoke sympathy for them, diminish the Petitioner's credibility, or cast

Petitioner in an unfavorable light. For example, Petitioner alleges in Ground Five that trial

counsel failed to present the video tape of Michael's (the older victim) police interview in which

law enforcement purports to pressure him to have his younger brother Matthew make similar

allegations. (Doc. No. 1 at 54). The MAR Court's summary denial of this claim was neither

contrary to nor an unreasonable application of clearly established Supreme Court law. Here, if

counsel had presented the video of Michael's police interview, the State could have successfully

---

[1]   Respondent contends in its brief in support of the summary judgment motion that the MAR
was denied based on procedural bar, but the MAR Court's order was an adjudication on the
merits.

moved to have the entire video tape presented, thus, repeating and reinforcing Michael's version of events and evoking sympathy for him. Defense counsel could have reasonably determined that any benefit that might be derived from presentation of the video was far outweighed by the harm it might do to Petitioner's case.

Next, Petitioner alleges in Ground Six that defense counsel was ineffective for failing to impeach Matthew with his initial statement to Social Services that his mother was aware of the ongoing sexual abuse. Matthew corrected his statement to detectives the next day. (Id. at 60). The MAR Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law. Defense counsel used reasonable trial strategy in deciding not to impeach Matthew on this point. If Matthew had denied making the statement, defense counsel would have had to call the social service worker to whom the statement was made, who most certainly on cross-examination would repeat Matthew's story and detail the circumstances of the statement, thus evoking further sympathy for Matthew and prejudicing Petitioner.

Next, Petitioner alleges in Ground Seven that defense counsel was ineffective for failing to further exploit Matthew's statement to his doctor that he had only recently become sexually active and his only partner had been his girlfriend—thus, denying any sexual contact with Petitioner. (Id. at 63-68). The MAR Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law. Here, Matthew was cross-examined about the statement extensively at trial, and he explained that he was a young boy who was embarrassed to tell his doctor. (Id. at 64). Further exploitation of the statement by counsel during closing argument would only remind the jury of the victim's youth, inexperience, shame, humiliation, and exploitation by Petitioner.

14

Next, Petitioner alleges in Ground Eight that defense counsel failed to acquire and exploit the police audio recording of another potential victim who denied any abuse.  (Id. at 69-72).  As Petitioner has conceded, however, there is no evidence that the audio tape even exists.  (Id. at 69).  Even if it did, it is questionable whether the police audio recording was relevant and admissible, as testimony that Petitioner may not have molested one child does not mean he did not molest the victims he was convicted of molesting.  Thus, the MAR Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

Finally, Petitioner alleges in Ground Eleven that defense counsel was ineffective for failing to present the testimony of Matthew's girlfriend, who—Petitioner alleges—made allegations of sexual abuse against her stepfather.  (Id. at 83-85).  Petitioner claims that this witness said her stepfather made her feel "uncomfortable," and that she temporarily moved out of state while her mother and stepfather worked it out.  (Id. at 83).  Petitioner presumably would like for counsel to have presented the testimony of this witness to show that she fabricated the claim against her stepfather and encouraged Matthew to do the same.  Again, counsel's trial strategy was reasonable, as this witness would necessarily repeat on cross-examination the circumstances of Matthew's account of the sexual abuse.  Thus, the MAR Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

The Court next addresses Petitioner's Grounds Two, Three, Four, Nine, Ten, and Twelve. Petitioner alleges in Ground Two that defense counsel was ineffective for failing to introduce a photograph that purportedly showed that Petitioner's penis did not have an upward curvature, a characteristic that the prosecution's witnesses described Petitioner as having.  (Id. at 29-42).

Petitioner alleges that, rather than introducing that particular photograph, counsel erroneously introduced another photograph. Petitioner also complains that the State was allowed an opportunity to impeach Petitioner and his wife by establishing that, in the photograph that was allegedly erroneously introduced, Petitioner had to hold his penis down to prevent its upward curvature. (Id. at 32-39). The MAR Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law. First, defense counsel did present evidence in an attempt to show that Petitioner's penis did not have the characteristic of an upward curvature. (Id. at 29-31). In any event, Petitioner fails to show that the outcome of the trial would have been different absent counsel's alleged deficient performance. The jury had before it ample evidence, through the testimony of both victims, to conclude that Petitioner was guilty.

Petitioner next alleges in Ground Three that counsel was ineffective for failing to properly subpoena Matthew's medical records. (Id. at 43-47). Defense counsel failed to follow proper procedures in subpoenaing the records and, as a result, the trial court limited the medical records that could be introduced at trial. Petitioner contends that if counsel had not made a mistake then the jury would have seen more of Matthew's medical records which, purportedly, would have revealed no evidence of past sexual abuse and no medical issues. The MAR Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law, as Petitioner has simply not shown that the outcome of his trial would have been different even if defense counsel had properly subpoenaed Matthew's medical records. Here, if proper procedures had been followed the victims would have had an opportunity to object and to request a hearing before the records were turned over to defense counsel. Furthermore, Petitioner makes no claim that the trial court would not have limited the records as

16

it did had the proper procedures been followed.

Petitioner next alleges in Ground Four that defense counsel was ineffective for his failure to object to the court's use of the word "victim." (Id. at 48-53). The MAR Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law, as there is no United States Supreme Court precedent prohibiting in court the use of the word "victim," or requiring that it be modified by the adjective "alleged." Here, Petitioner has simply not shown that counsel rendered deficient performance for failing to object to the court's use of the word "victim" at trial.

Petitioner next alleges in Ground Nine that defense counsel failed to petition the court to transcribe opening and closing statements and the audio portion of exhibits played to the jury. (Doc. No. 1 at 73-77). The MAR Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law. Even assuming that this was a professional error, Petitioner has not shown that outcome of the trial would have been different absent the error.

Petitioner next alleges in Ground Ten that defense counsel failed to move to strike various testimony from the record after the Court sustained counsel's objections. (Id. at 78-82). Petitioner cites several examples of when the Court sustained counsel's objections. Defense counsel objected to both answers, and the court sustained the objections. The MAR Court's summary denial of Petitioner's claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law, as the Supreme Court has never recognized a constitutional violation based on counsel's failure to move to strike testimony following a court's sustaining of an objection to testimony.

Petitioner next alleges in Ground Twelve that defense counsel was ineffective because he

suggested to the jury by his word choice that sexual abuse had occurred.  (Id. at 86-89).  The

MAR Court's summary denial of this claim was neither contrary to clearly established Supreme

Court law, as Petitioner has not shown that, even if counsel's performance was deficient, any

error affected the outcome of Petitioner's trial.

C.  Grounds Thirteen, Fourteen, and Fifteen

Petitioner asserts ineffective assistance of appellate counsel in Grounds Thirteen,

Fourteen, and Fifteen based on his contention that appellate counsel failed to raise various

arguments on appeal.  In the context of claims of ineffective assistance of appellate counsel, the

United States Supreme Court has observed that "winnowing out weaker arguments on appeal and

focusing on those more likely to prevail, far from being evidence of incompetence, is the

hallmark of effective appellate advocacy."  Smith v. Murray, 477 U.S. 527, 536 (1986)

(quotation omitted).  For the following reasons, the MAR Court's denial of Petitioner's Grounds

Thirteen, Fourteen, and Fifteen was neither contrary to nor an unreasonable application of clearly

established Supreme Court law.

First, in Ground Thirteen, Petitioner contends that appellate counsel was ineffective for

failing to raise on direct appeal that an evidence technician called by the defense was allowed

during cross-examination to render expert opinions.  (Doc. No. 1 at 90-95).  The defense had

called the evidence technician to establish that he had collected what he believed to be DNA

samples from Petitioner's vehicle—the location of several sexual encounters between one of the

victims and Petitioner.  The defense had also called the lab technician who tested the samples to

establish that no semen was found among any of the collected samples.  (Id. at 90).  On cross-

examination, the State asked the evidence technician, based on his experience, to explain the

likelihood that DNA evidence might be recovered from a surface after the passage of time, and

18

the circumstances that might cause it to degrade. The MAR Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law. The evidence technician was not rendering an expert opinion on the facts of Petitioner's case, but offering a lay opinion to clarify testimony Petitioner had placed before the jury. See State v. Thorne, 173 N.C. App. 393, 618 S.E.2d 790 (2005) (police officer allowed to express lay opinion under N.C. GEN. STAT. § 8C-1, Rule 701—based in part on his training—on the defendant's gait to help jury identify the perpetrator). Thus, counsel's failure to raise this claim was not deficient and, in any event, Petitioner has not shown that the outcome of the trial would have been different absent any alleged deficient performance by Petitioner.

Next, in Ground Fourteen, Petitioner contends that appellate counsel was ineffective for his failure to raise on direct appeal purported Brady issues. Specifically, he complains that three photographs of his inner thighs taken by police to identify skin anomalies described by one of the victims were not turned over until trial. (Doc. No. 1 at 96-99). Other photographs of his inner thighs taken at the same time were tendered in advance of trial. Petitioner contends that various photographs that were not disclosed before trial would have shown that Petitioner did not have certain scars on his legs that had been identified by various witnesses. Under clearly established Supreme Court law, the accused has the right to receive from the prosecution exculpatory, favorable evidence, i.e., evidence that is material either to guilt or to punishment. See Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Kyles v. Whitley, 514 U.S. 419, 435 (1995) (exculpatory evidence is evidence the suppression of which would "undermine confidence in the verdict"); Giglio v. United States, 405 U. S. 150, 154 (1972) (exculpatory evidence includes "evidence affecting" witness "credibility," where the witness' "reliability" is likely "determinative of guilt or innocence"). Evidence is material only if "there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). The MAR Court's adjudication of this claim was neither contrary to nor an unreasonable application of Supreme Court law. Even if Petitioner could show that counsel was ineffective for raising a Brady issue on appeal, Petitioner has not shown that the outcome would have been different if the prosecution had disclosed the alleged exculpatory evidence.

Next, in Ground Fifteen, Petitioner contends that appellate counsel was ineffective for failing to raise on direct appeal trial counsel's failure to move to strike testimony from the record to which objections had been sustained. (Doc. No. 1 at 100-02). This is the same claim raised by Petitioner as to trial counsel in Ground Ten. For the same reasons that Ground Ten is without merit, Petitioner's Ground Fourteen also fails.

## IV.    CONCLUSION

For the reasons stated herein, Respondent is entitled to summary judgment.

**IT IS, THEREFORE, ORDERED** that:

1. Respondent's Motion for Summary Judgment, (Doc. No. 8), is **GRANTED** and the § 2254 petition is **DISMISSED** with prejudice.

2. It is further ordered that, pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and

that the petition states a debatable claim of the denial of a constitutional right).

Signed: November 20, 2014

Frank D. Whitney
Chief United States District Judge